**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ACROCORE EXTERIOR MOULDINGS, LLC. | Case No.: |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| DRYVIT SYSTEMS, INC.,<br>RPM INTERNATIONAL, INC. | |
| Defendants. | |

Plaintiff Acrocore Exterior Mouldings, LLC. ("Acrocore"), by and through undersigned counsel, alleges and asserts the following claims and causes of action against Defendants Dryvit Systems, Inc. ("Dryvit") and RPM International ("RPM"):

## NATURE OF THE ACTION

1. This is an action for breach of contract, breach of the implied covenant of good faith and fair dealing, and fraud.

2. Specifically, this action concerns Dryvit, a major manufacturer of exterior cladding products, fraudulently inducing Acrocore to sign an agreement. As set forth with particularity below, Dryvit's fraud is especially egregious inasmuch as it involves Dryvit's material misrepresentations about the fire propagation characteristics of products applied to the exteriors of commercial and residential buildings across the United States.

3. After fraudulently inducing Acrocore to sign the agreement, Dryvit actively worked against Acrocore to ensure that Acrocore was deprived of the fruits of the agreement. Thereafter, Defendants materially breached the agreement.

4. RPM is Dryvit's parent company and, at all times relevant to this Complaint, RPM was a moving force throughout the negotiation and performance of the agreement. RPM was

1

also a moving force behind the breach.  RPM's subsidiaries include Dryvit and Tremco Incorporated ("Tremco").

## INTRODUCTON

5. On or about May 1, 2016, Acrocore, a New Jersey company, entered into an exclusive four-year Agreement with Dryvit wherein Acrocore would purchase Dryvit's shape base, shape admixture, shape extender, and shape mesh (the "Products") and then use the Products to manufacture "Mouldings"[1] and sell them to Dryvit's exclusive distribution network.

6. The May 1, 2016 Agreement was subsequently extended through 2023 by way of a First Addendum signed in 2018.  The First Addendum also expanded the definition of Mouldings to include "starter boards."  Thereafter, in 2019, a Second Addendum was signed extending the contract to 2024.[2]  The May 1, 2016 Agreement, the First Addendum, and Second Addendum are referred to herein as "the Agreement."  (Exhibit A, the Agreement).

7. During the term of the Agreement, entities within the exclusive distribution network purchased the Mouldings, which were integrated into Dryvit "Outsulation Systems" and applied on residential and commercial buildings.  (Exhibit A, the Agreement).

8. Mouldings, which include shapes and starter boards, are polymer based, flexible cement-coated, expanded polystyrene parts.  And, an Outsulation System includes Mouldings, adhesive, continuous insulation, shape mesh embedded in base coat, and finish, all of which are installed sequentially on the exterior of commercial and residential buildings.

---

[1] Also referred to by the parties and herein as "shapes" and "starter boards."
[2] Among other things, the Second Addendum expanded the definition of "Mouldings" to include flexible cement coated EPS interior mouldings, and expanded "Products" to include white shape base, Genesis DM, and Primus DM.

9. Under the Agreement, Acrocore sold the Mouldings under the brand name "Dryvit Shapes by Acrocore" and Acrocore paid a royalty to Dryvit for each unit sold to the exclusive distribution network. (Exhibit A, the Agreement).

10. During the term of the Agreement, Outsulation Systems, which incorporated the Mouldings, were installed on commercial and residential buildings throughout the United States.

11. For instance, in the June 2019 edition of the AWCI Construction Dimensions Magazine, Dryvit announced:

> For the massive, four building, 425,000 square foot, 411-unit multi-family complex in the Germantown suburb of Nashville, TN, Dryvit Shapes by Acrocore and Starter Boards played a critical role in the speed and application of Dryvit's Outsulation® Plus MD System. The unique dimensional design of the buildings required pre-coated Starter Boards, and the pre-coated EPS shapes added the design luster.

(Exhibit B, June 2019 AWCI Construction Dimensions Magazine).

12. Before entering into the Agreement, and in an effort to induce Acrocore, Dryvit represented that the Products conformed to Dryvit's published data sheets, which referenced compliance with the NFPA and ASTM standards pertaining to fire spread. And, Dryvit represented that the Products would allow Acrocore to manufacturer code-compliant Mouldings for sale to the exclusive distribution network.

13. Building codes throughout the United States -- enacted to protect public health, safety, and general welfare as they relate to the construction and occupancy of buildings and structures -- require that exterior wall assemblies comply with NFPA-285 and ASTM E84.

14. Under the Agreement, as a material term, Dryvit warranted and covenanted that the Products conformed "in all materials aspects" to "Dryvit's published data sheets for the Products with respect to…testing."  (Exhibit A, the Agreement).

15. Despite Dryvit's pre-contractual representations and the Agreement's clear, material terms, on October 30, 2019, Dryvit informed Acrocore -- and Acrocore has come to independently learn -- that the published data sheets were false and that, in fact, the Outsulation Systems and integrated Mouldings were not compliant with NFPA-285 and ATSM E84.

16. Moreover, despite an International Code Council (ICC) Evaluation Report (ICC-ES Report ESR-2391) presented and published by Dryvit, which indicated compliance with NFPA-285 and ATSM E84, Dryvit Prefabricated Foam Plastic Formed Shapes were actually non-compliant.  (Exhibit C, ICC-ES Report ESR 2391).

17. Acrocore is informed and believes that, at some point before the Agreement, Dryvit -- in an effort to reduce costs and increase its profits -- changed its supplier of the polymer additives integrated into the Products.

18. Despite the replacement of its polymer additive supplier, and the resulting change in the chemical composition of the Products as a result of the replacement of the polymer additive supplier, Dryvit decided that in a further effort to reduce costs and increase its profits: a) Dryvit would not perform all of the required NFPA 285 and ASTM E84 fire tests; and b) Dryvit would not fulfill its duty to notify the ICC that ICC-ES Reports could not be renewed or reissued for Outsulation Systems and components containing the new polymer additives.

19. Rather, Dryvit continued to certify and advertise to Acrocore, to the exclusive distribution network, and to the public at large, that the Outsulation Systems and components were fully tested and code compliant. Indeed, ICC-ES Report ESR-2391, reissued on January 2018, falsely provides, in pertinent part: "Evidence Submitted: Reports of Tests in Accordance with ASTME84 (UL723), NFPA 285, and NFPA 268." (Exhibit C, ICC-ES Report ESR 2391).

20. In November of 2019, Dryvit informed Acrocore that, in view of the non-compliance with NFPA 285 and ASTM E84, and notwithstanding the Agreement, Dryvit could not sell Acrocore shape base or shape admixture that would enable Acrocore to manufacture and sell code-compliant Mouldings. At that time, Tremco senior executive Doug Rende told Acrocore's president -- in the presence of, among others, Dryvit's legal counsel and corporate officer Nikki Wakeman (a.k.a Gubata) -- "[Acrocore] may say …'you can't provide me with code compliant materials.' Fine. You're right. So, the Agreement is voided."

21. Acrocore has learned that Dryvit has taken steps to: a) further conceal the lack of NFPA and ASTM code compliance; and b) ensure that Dryvit could eventually claim[3] that Acrocore was in material breach of the Agreement. Specifically, under the Agreement, Acrocore is required to maintain an "ICC-ES Report," and, indeed, Acrocore has consistently maintained an ICC-ES Report throughout the course of the Agreement. Maintaining an ICC-ES Report is contingent upon, inter alia, an inspection by an independent third party testing organization. Throughout the course of the Agreement, third party testing organization RADCO performed inspections at Acrocore, and another

---

[3] Plaintiff contends that such a claim would be without merit.

inspection was scheduled for November 13, 2019.  Acrocore learned from its conversations with RADCO that Dryvit had "shut down" the inspection and that despite Acrocore having coordinated and made preparations for the inspection, RADCO would not be going forward with the inspection.

22. Though Dryvit has explained to Acrocore that it considers the Agreement "voided," Dryvit has not revealed to Acrocore how Dryvit intends to remedy the 360,000 lineal feet of non-compliant Outsulation applied to commercial and residential buildings throughout the United States since 2016 – including, for instance, the 411-unit Lifestyle Communities residential complex in Nashville, Tennessee.

## THE PARTIES

23. Acrocore is a New Jersey Limited Liability Company formed in 2012.  Acrocore's principal place of business is Clifton, New Jersey.

24. Dryvit is a Rhode Island corporation that is headquartered in West Warwick, Rhode Island.  According to information on the website of Dryvit's parent company RPM International, Inc., "Dryvit is the leading manufacturer of specialty exterior cladding systems. In 1969, it pioneered the concept of 'Outsulation,' which provides an air- and water-resistive barrier, continuous insulation and design-flexible aesthetics to duplicate the look of limestone, brick, stucco, granite, metal panels and more. Among its leading products are the Outsulation Plus MD moisture drainage exterior insulation finishing system (EIFS), AquaFlash liquid-applied flashing system and Backstop NT air- and water-resistive barrier."

25. RPM is a Delaware corporation that is headquartered in Ohio.  According to information on its website, "RPM International Inc. owns subsidiaries that manufacture and market

high-performance coatings, sealants and specialty chemicals, primarily for maintenance and improvement."

## JURISDICTION AND VENUE

26. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

27. At all times relevant to this Complaint, Acrocore was a New Jersey company with its principal place of business in New Jersey.

28. At all times relevant to this Complaint, Dryvit was a Rhode Island company with its principal place of business in Rhode Island.

29. At all times relevant to this Complaint, RPM was a Delaware company with its principal place of business in Ohio.

30. The Agreement includes a forum selection clause that provides either party may file suit in the state or federal courts of New Jersey.  (Exhibit A, the Agreement).

31. The Agreement also includes a choice of law provision that provides for New Jersey law to apply to disputes arising out of the Agreement. (Exhibit A, the Agreement).

32. This district is a proper venue for this action pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## THE EVENTS NECESSITATING THIS ACTION

**Before the Agreement**

33. Before entering into the Agreement, Dryvit affirmatively represented, orally and in writing, full compliance with the NFPA and ASTM.

34. By way of example, on March 14, 2016, Dryvit's Senior Engineer and Code Specialist Bill Preston sent an email to, among others, Acrocore's president (with a copy to Dryvit executive, Tony Stall), and wrote: "Attached, please find the updated ESR 2931 for prefabricated foam shapes." The attached ESR 2931 referenced the Products under the "Materials" section and, under the "Evidence Submitted" section, provided: "Reports of tests in accordance with, ASTM E84 (UL 723), NFPA 285 and NFPA 268."

35. In reliance on, *inter alia*, these affirmative, material representations, Acrocore was induced to, among other things, make a series of major equipment expenditures and investments into its manufacturing facility and its business to ensure Acrocore would be equipped to fulfill anticipated orders by Dryvit's exclusive distribution network.

36. Moreover, in reliance on these affirmative, material representations, Acrocore was induced to, among other things, cease its lucrative, ongoing business-relationship with Dryvit's competitor OldCastle (a subsidiary of CRH Americas), and enter into the Agreement, which was exclusive.

**Before Entering into the Agreement, Dryvit Changed its Polymer Additives**

37. Acrocore is informed and believes that before the Agreement was signed, Dryvit -- in an effort to reduce costs and increase its profits -- changed its supplier of the polymer additives integrated into the Products.

38. Even though Dryvit replaced its polymer additive supplier, which resulted in a change in the chemical composition of the Products, Dryvit decided that in a further effort to reduce costs and increase its profits Dryvit would not perform all of the required NFPA 285 and ASTM E84 fire tests.

39. And, even though Dryvit replaced its polymer additive supplier, Dryvit opted not to fulfill its duty to notify the ICC that ICC-ES Reports could not be renewed or reissued for Products, Mouldings, or Outsulation Systems containing the new polymer additives.

40. Rather, Dryvit continued to falsely represent, certify, and advertise to Acrocore, to distributors, and to the public at large that the Outsulation Systems and their components were fully tested and code compliant.

41. Given Dryvit's prior public pronouncements about exterior insulation and finish systems ("EIFS") following a 2008 fire at the Monte Carlo casino, Dryvit's acts and omissions with respect to its polymer additive change (as described herein) are the height of hypocrisy.  Specifically, Dryvit stated:

> EIFS function as a safe and durable building cladding. This has been long confirmed by fire testing conducted under test procedures promulgated by the National Fire Protection Association. EIFS are fire-resistant. They are composed of a fire-retardant, expanded polystyrene insulation board, fiberglass reinforced base coat, and acrylic finish coat. EIFS has proven itself in both the laboratory and in real world situations to perform as designed and tested…Because there are untested or inadequately tested materials that closely resemble the appearance of EIFS, **it is of special concern to Dryvit** and the EIFS Industry Members Association (EIMA) **to emphasize that architects and developers should specify and use only fully fire-tested wall cladding materials** such as EIFS. (Exhibit D, Dryvit Statement Regarding the Fire at the Monte Carlo Casino). (emphasis added).

**The Agreement, the Published Data Sheets, and the Specifications**

42. On May 1, 2016, the parties entered into the Agreement.  (Exhibit A, the Agreement).

43. As set forth above, the Agreement provided, among other things that Acrocore would purchase the Products and then use the Products to manufacture Mouldings and sell them to Dryvit's exclusive distribution network.  (Exhibit A, the Agreement).

44. Paragraph 2 of the Agreement provides, in relevant part: "Dryvit shall make available and sell Products to Acrocore ..." (Exhibit A, the Agreement).

45. Paragraph 4 of the Agreement provides, in relevant part, that: "Acrocore shall purchase 100% of its requirements for the Products…exclusively from Dryvit."  (Exhibit A, the Agreement).

46. Paragraph 17 of the Agreement provides, in relevant part: "Dryvit further warrants that the Products will conform in all material aspects to Dryvit's published data sheets for the Products with respect to description, packaging, coverage, working time, drying time and **testing**.  (Exhibit A, the Agreement) (emphasis added).

47. Dryvit included Acrocore within its Quality Control Manual (revision date 11/2015) for the production of Prefabricated Foam Plastic Shapes produced by Acrocore.  (Exhibit E, Quality Control Manual).

48. The Quality Control Manual annexed Dryvit's published data sheet (DS807) entitled "Base Coat Application For Machine-Coated Dryvit EPS Shapes," which applies to the Products under the Agreement and is one of the published data sheets implicitly referenced in Paragraph 17 of the Agreement.  (Exhibit F, DS807).

49. Indeed, the description section of DS807 provides: "The base coat application for machine-coated Dryvit EPS Shapes combines Shape Mesh and a two-part, polymer-based, cementitious material (**Shape Base and Shape Admixture**) formulated for optimal flow in producing prefabricated shapes and starter pieces. The resultant base coat dries smooth, is highly flexible and is ready for finish application."  (Exhibit F, DS807) (emphasis added).

50. Under the testing section of DS807, the following table, in relevant part, is provided:

| TEST | TEST METHOD | CRITERIA | RESULTS |
|---|---|---|---|
| Surface Burning Characteristics | ASTM E84 | Flame Spread<25 Smoke Developed <450 | Flame Spread Index: 5 |

| | | | Smoke Developed Index: 15 |
|---|---|---|---|
| Intermediate Scale Multi-Story Fire Test | NFPA 285 | Resist Flame Propagation | Passed |

(Exhibit F, DS807).

51. During the course of the Agreement, Acrocore fully performed its contractual obligations by, *inter alia*, taking steps necessary to be listed as a manufacturer on an ICC-ES report for Dryvit Prefabricated Foam Plastic Formed Shapes, purchasing 100% of its requirements for the Products exclusively from Dryvit, and selling Mouldings to Dryvit's exclusive distribution network.

52. Thereafter, the entities within the exclusive distribution network sold Dryvit Outsulation systems, with integrated Acrocore Mouldings, for use on building exteriors throughout the United States.

53. For instance, Dryvit's Outsulation Plus MD System Specifications document (DS853), provides, in relevant part under Section 2.02.B.9: "Pre Base Coated EPS Shapes and Starter Boards: Shall be supplied by Acrocore or other approved shape manufacturer." (Exhibit G, DS853).

54. And, Dryvit's Outsulation System Installation Details document (DS107) references the Dryvit Shapes by Acrocore Pre-base coated starter board.  (Exhibit H, DS107).

55. Similarly, Acrocore is included and referenced within, for instance, the following: a) Dryvit's Outsulation LCMD Systems 1-5 Installation Details document (DS170); b) Outsulation LCMD Systems 1-5 (DS838); c) Outsulation RMD System (DS106); and d) Outsulation RMD System Specifications (DS115).

56. Dryvit represented to Acrocore, to the exclusive distribution network, and to the public at large that the Outsulation Systems and its component parts had been tested to ensure compliance with the NFPA, the ASTM, and building codes.

57. Indeed, in Dryvit's Outsulation Solutions from Dryvit (DS266), Dryvit represented: "The benefits of Outsulation have been realized in hundreds of thousands of projects around the world, and the systems provide a single-source, seamless and sustainable cladding solution for buildings of any shape, size and type. Simply put, Outsulation systems **provide everything you need from a building code perspective**, and everything you want from a performance and aesthetic standpoint." (Exhibit I, DS266) (emphasis added).

58. And, in its Outsulation Specification (DS 447), Dryvit represented:

"Testing. As the pioneer and leader in construction technology, Dryvit has always considered stringent testing important; the Outsulation family of systems is no different. **The Outsulation System has been fully tested on the widest possible spectrum of tests and is fully code compliant.**" (Exhibit J, DS447) (emphasis added).

59. Further, and by way of example, Dryvit's Outsulation Plus MD System Performance Criteria document (DS852), provides, in relevant part:

Outsulation Plus MD is a fully tested, code compliant system consisting of an air/water-resistive barrier, adhesive/drainage medium, continuous insulation (CI), reinforced base coat and a durable exterior finish. The below tables represent the numerous tests that this wall assembly has been subjected to, as well as the results:

...

1(e). Fire Performance

| TEST | TEST METHOD | CRITERIA | RESULTS |
|------|-------------|----------|---------|
| Fire Resistance | ASTM E119 | No effect on the fire resistance of a rated wall assembly | Passed 1 hour non-load bearing |

| | | | Passed 2-hour load bearing over wood framing |
|---|---|---|---|
| Ignitability | NFPA 268* | No ignition at 12.5 kw/m2 at 20 minutes | Passed |
| Intermediate Multi-Story Fire Test | NFPA 285* (UBC 26-9) | 1. Resist flame propagation over the exterior surface<br>2. Resist vertical spread of flame within combustible core/component of panel from one story to the next<br>3. Resist vertical spread of flame over the interior surface from one story to the next<br>4. Resist lateral spread of flame from the compartment of fire origin to adjacent spaces | Passed over steel framing and wood framing |
| Full Scale Multi-Story (1) (corner test) | ANSI FM 4880 | Resist flame propagation over the exterior surface | Passed; No Height restrictions* |

\* ASTM E 2568 Standard Specification for PB Exterior Insulation and Finish Systems.
(1). Dryvit FM Products must be specified.

2. The Outsulation Plus MD components have been tested for:

a. Fire

| TEST | TEST METHOD | CRITERIA | RESULTS |
|---|---|---|---|
| Surface Burning Characteristics | ASTM E 84* | All components shall have a:<br><br>Flame Spread ≤ 25<br>Smoke Developed ≤ 450 | Passed |

\*ASTM E 2568 Standard Specification for PB Exterior Insulation and Finish Systems.

b. Durability

| TEST | TEST METHOD | CRITERIA | RESULTS |
|---|---|---|---|
| Flame Spread | ASTM E 84* | 25 max. | Passed |
| Smoke Developed | ASTM E 84* | 450 max. | Passed |

\*ASTM E 2568 Standard Specification for PB Exterior Insulation and Finish Systems.

(Exhibit K, DS852).

60. Similarly, Dryvit represented NFPA 285 and ASTM E 84 compliance in, for instance, the

following: a) Outsulation System Specifications (DS118); b) Outsulation System

13

Performance Criteria (DS856); and c) Outsulation Plus MD System Specifications (DS137).

61. As set forth on DS445, the Outsulation Plus MD data sheet: "Dryvit's original Outsulation System has been installed on over 500,000 buildings worldwide.  Due to the increased demands for a wall system to be able to drain away incidental moisture, the Outsulation concept has grown into a family of related systems, each building upon the other to achieve specific performance goals."  (Exhibit L, DS445).

62. During the course of the Agreement, Acrocore consistently sold approximately $1.2 million of Mouldings, per year, to the exclusive distribution network.  Thereafter, the Mouldings were integrated into Outsulation systems on buildings across the country.

**RPM is a Moving Force behind the Negotiation and Performance of the Agreement**

63. Before entering into the Agreement on May 1, 2016, Acrocore's negotiations with Dryvit occurred via email with Nikki Wakeman (a.k.a. Gubata) and Tony Stall.  In many of those emails, Dryvit included the message that the email was "the property of Dryvit/RPM International Inc. or one of its operating companies."

64. On June 2, 2017, Tom McGee, vice president of corporate development for RPM, emailed Dryvit's CEO, Mike Murphy, indicating: "both of [Acrocore's] products -- the starter board and shapes -- could be big winners for us."

65. Between March 14, 2019 and March 20, 2019, Acrocore negotiated its Second Addendum.  During this time, Dryvit's in house counsel Nikki Wakeman (a.k.a Nikki Gubata) sent emails to Acrocore indicating the following: 1) Dryvit could not negotiate and finalize the Addendum without RPM's approval; 2) RPM had instituted a "policy"

with respect to contract review; and 3) RPM's attorneys needed to "sign off" on the Addendum before Dryvit could enter into it.

66. Upon information and belief, Doug Rende, a Tremco executive, has followed RPM's directives with respect to decisions pertaining to, *inter alia*, Dryvit's performance under the Agreement and the statement that the Agreement is "voided."

**The October 30, 2019 Meeting**

67. As set forth above, on October 30, 2019, Dryvit informed Acrocore that: a) the published data sheets were false and that, in fact, the Outsulation Systems were not compliant with NFPA-285 and ATSM E84; and b) Dryvit is unable and unwilling to sell Acrocore shape base and shape admixture that allow Acrocore to manufacturer code-compliant Mouldings.

68. The October 30, 2019 meeting was attended by Acrocore's president and by Dryvit's CEO Mike Murphy, Dryvit executives Barbara Catlow and Brian Turner, and Tremco executive Doug Rende.

69. During the meeting, Doug Rende stated that Dryvit failed its NFPA 285 test on the Outsulation 4 inch wall assembly.

70. During this meeting, Brian Turner, Dryvit's vice president of Research/Technology & Engineering, also addressed the 4 inch NFPA 285 test, stating: "we did not get a passing result."

71.  This revelation by Doug Rende and Brian Turner necessarily means that the published data sheets were false and that, in fact, the Outsulation and integrated Mouldings were not compliant with NFPA-285 and ASTM E84.

72. This also necessarily means that application of the Outsulation was not in compliance with International Building Codes, which requires that exterior insulation and finish systems like Outsulation pass NFPA-285 testing.

73. Thus, despite an International Code Council (ICC) Evaluation Report (ICC-ES Report ESR-2391) presented and published by Dryvit and which indicates compliance with NFPA-285 and ATSM E84, the Outsulation System and integrated Moulding are non-compliant with NFPA-285 and ASTM E84.  (Exhibit C, ICC-ES Report EST-2391).

**Dryvit Surreptitiously tries to make it appear that Acrocore has Breached the Contract**

74. Acrocore learned that Dryvit had taken steps to: a) further conceal the lack of NFPA and ASTM code compliance; and b) ensure that Dryvit could eventually claim that Acrocore was in material breach of the Agreement.

75. Specifically, under the Agreement, Acrocore is required to maintain an "ICC-ES Report," and, indeed, Acrocore has diligently maintained an ICC-ES Report throughout the course of the Agreement.

76. Maintaining an ICC-ES Report is contingent upon, *inter alia*, an inspection by an independent third party testing organization.

77. Throughout the course of the Agreement, third party testing organization RADCO performed inspections at Acrocore.  For the period between January 2020 and January 2022, another inspection was scheduled for November 13, 2019.

78. Acrocore learned from its conversations with RADCO that Dryvit had "shut down" the inspection and that despite Acrocore having coordinated and made all necessary preparations for the inspection, RADCO would not be going forward with the inspection.

**The November 2019 Meeting**

79. In November of 2019, Dryvit informed Acrocore that, notwithstanding the Agreement Dryvit could not: a) sell Acrocore Products that conformed to the published data sheets and b) sell Acrocore Products that allow Acrocore to manufacturer code-compliant Mouldings that can be sold to the exclusive distribution network.

80. As set forth above, Doug Rende told Acrocore's president: "the Agreement is voided."

**During the Course of the Agreement, Dryvit Actively Worked against Acrocore**

81. Throughout the course of the Agreement, Dryvit actively worked against Acrocore to ensure that Acrocore would have limited access to its exclusive distribution network.

82. Indeed, Acrocore was only provided access to a fraction of the entities within the exclusive distribution network. Dryvit's acts and omissions in this regard have been confirmed by former Dryvit employees with direct knowledge.

83. While, as set forth above, Acrocore consistently sold approximately $1.2 million of Mouldings per year to the exclusive distribution network, this represented sales to approximately 10% of the exclusive distribution network.

84. On January 6, 2017, Dryvit executive Tony Stall sent an email to Acrocore entitled "Starter board program and promotion" to Acrocore's president. Various Dryvit employees, including vice president of sales John Elkas, were copied on this email. In the email, Tony Stall set out the marketing plan to ensure "ALL distributors" participated in the Dryvit Shapes by Acrocore purchasing.

85. In the January 6, 2017 email, Tony Stall indicated that after "region and logistics are determined… we begin communicating the program to those who will be affected first – and that means sales team and internal personnel first, then distributors. That

communication will be done by Dryvit Marketing."  Tony Stall also stated "this communication will explain/define the product, the packaging, the pricing, and the promotion planned. (4 P's). Further, it will conclude that all distributors, because of their exclusive status with Dryvit, will be expected (and why wouldn't they want to?) to participate."

86. Further, in the January 6, 2017 email, Tony Stall stated that:

> "after the first communication goes out explaining the program and how it is going to transpire – then and ONLY then will Acrocore begin the process of contacting distributors and taking orders from the target group for stocking inventory, in advance of the marketing promotional efforts commencing. Distributors will be expecting this call because it will have been clearly explained in the first marketing communication…Ideally, [Acrocore] will secure 100% participation from the target group…If not, the sales team will be apprised of those who have NOT chosen to participate, and immediate action will be taken by them to reverse that refusal."

87. Notwithstanding this email from Tony Stall and other similar emails and communications, Dryvit did not promote Dryvit Shapes by Acrocore and refused to provide Acrocore with access to the entire exclusive distribution network.  Indeed, Dryvit actively worked against Acrocore to ensure sales remained stagnant throughout the Agreement.

88. Based on multiple accounts from former Dryvit employees with direct knowledge, Acrocore has been informed and believes that in early 2018, Dryvit CEO Mike Murphy instructed Dryvit sales and marketing personnel to refrain from or completely stop promoting Dryvit Shapes by Acrocore to the exclusive distribution network.

89. Thereafter, on September 10, 2018, Tony Stall emailed Acrocore's president: "let's discuss tomorrow how we can try and engage the target distributors on a limited basis…the hang-up now is the sales team…".

90. Dryvit acted in bad faith and with an improper motive when it refrained from and stopped promoting Dryvit Shapes by Acrocore to its exclusive distribution network.

91. But for Dryvit actively working against Acrocore, Acrocore's sales would have been exponentially greater, i.e., it follows that if $1.2 million in sales per annum represents transactions with 10% of the network then access to a greater percentage of the network would have resulted in greater sales revenue.

### CAUSES OF ACTION
### COUNT I
### BREACH OF CONTRACT
### (As to Both Defendants)

92. Acrocore incorporates and realleges paragraphs 1 through 91 of the Complaint as if set forth here in full.

93. The parties entered into a valid and enforceable Agreement, which was fully executed on May 1, 2016 and extended by way of a First Addendum and Second Addendum.

94. Acrocore fully performed under the Agreement.

95. Paragraph 2 of the Agreement provides, in relevant part: "Dryvit shall make available and sell Products to Acrocore ..." (Exhibit A, the Agreement).

96. Paragraph 4 of the Agreement provides, in relevant part, that: "Acrocore shall purchase 100% of its requirements for the Products…exclusively from Dryvit."  (Exhibit A, the Agreement).

97. Paragraph 17 of the Agreement provides, in relevant part: "Dryvit further warrants that the Products will conform in all material aspects to Dryvit's published data sheets for the Products with respect to description, packaging, coverage, working time, drying time and **testing**.  (Exhibit A, the Agreement) (emphasis added).

98. Dryvit included Acrocore within its Quality Control Manual (revision date 11/2015) for the production of Prefabricated Foam Plastic Shapes produced by Acrocore.  (Exhibit E, Quality Control Manual).

99. The Quality Control Manual annexed Dryvit's published data sheet (DS807) entitled "Base Coat Application For Machine-Coated Dryvit EPS Shapes," which applies to the Products under the Agreement and is one of the published data sheets implicitly referenced in Paragraph 17 of the Agreement.  (Exhibit F, DS807).

100.    The description section of DS807 provides: "The base coat application for machine-coated Dryvit EPS Shapes combines Shape Mesh and a two-part, polymer-based, cementitious material (**Shape Base and Shape Admixture**) formulated for optimal flow in producing prefabricated shapes and starter pieces. The resultant base coat dries smooth, is highly flexible and is ready for finish application."  (Exhibit F, DS807) (emphasis added).

101.    Under the testing section of DS807, the following table, in relevant part, is provided:

| TEST | TEST METHOD | CRITERIA | RESULTS |
|---|---|---|---|
| Surface Burning Characteristics | ASTM E84 | Flame Spread<25 Smoke Developed <450 | Flame Spread Index: 5 Smoke Developed Index: 15 |
| Intermediate Scale Multi-Story Fire Test | NFPA 285 | Resist Flame Propagation | Passed |

(Exhibit F, DS807).

102.    Defendants materially breached the Agreement by, *inter alia*, being unable and unwilling to: a) sell Acrocore Products that conformed to the published data sheets and b)

sell Acrocore Products that allow Acrocore to manufacturer code-compliant Mouldings that can be sold to the exclusive distribution network.

103.     More than 14 days ago, Acrocore provided written notice of the parties' disputes to Dryvit and Dryvit could not and would not timely resolve the disputes.

104.     As set forth herein, RPM was a moving force behind the negotiation, performance, and breaches, and RPM is, along with Dryvit, liable.

105.     As a result of such material breaches, Acrocore has been and will continue to be severely damaged in an amount to be determined at trial.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(As to Dryvit)**

106.     Acrocore incorporates and realleges paragraphs 1 through 105 of the Complaint as if set forth here in full.

**First Breach**

107.     The Agreement was exclusive and limited Acrocore's sales to Dryvit's exclusive distribution network.  During the course of the Agreement, Dryvit acted unreasonably, in bad faith, and for an improper motive when its CEO affirmatively instructed the Dryvit sales and marketing personnel to refrain from and stop promoting Dryvit Shapes by Acrocore.

108.     Given that Dryvit's CEO's instructions were followed, Dryvit's conduct had the effect of injuring Acrocore's right to receive the fruits of the Agreement.

109.     Acrocore's per annum sales averaged approximately $1.2 million.  But for Dryvit actively working against Acrocore, Acrocore's sales would have been exponentially greater.

110.     As a result of this breach, Acrocore has been and will continue to be severely damaged in an amount to be determined at trial.

**Second Breach**

111.     Moreover, under the Agreement, Acrocore is required to maintain an "ICC-ES Report," and, indeed, Acrocore has maintained an ICC-ES Report throughout the course of the Agreement.

112.     By Dryvit "shutting down" the RADCO inspection that Acrocore coordinated and scheduled for November 13, 2019, Dryvit acted unreasonably, in bad faith, and for an improper motive.  Dryvit's conduct has the effect of injuring Acrocore's right to receive the fruits of the Agreement.

113.     As a result of this breach, Acrocore has been and will continue to be severely damaged in an amount to be determined at trial.

**COUNT III**
**FRAUD**
**(As to Dryvit)**

114.     Acrocore incorporates and realleges paragraphs 1 through 113 of the Complaint as if set forth here in full.

115.     Before entering into the Agreement, Dryvit made representations in writing that the Products, the Mouldings, and the Outsulation systems into which the Products were integrated, were code compliant and conformed to the published data sheets.

116.     Before entering into the First Addendum and Second Addendum, Dryvit made representations in writing that the Products, the Mouldings, and the Outsulation systems into which the Products were integrated, were code compliant and conformed to the published data sheets.

22

117.     When these representations were made, Dryvit knew they were false.  Indeed,
Dryvit's acts and omissions in this regard were accompanied by a wanton and willful
disregard for Acrocore and all persons who foreseeably might rely upon and be harmed
by Dryvit's acts and omissions.

118.     When these representations were made, Dryvit knew that Acrocore would rely
upon them.

119.     Acrocore did, in fact, rely on these representations -- which Acrocore did to its
detriment -- by, among other things: a) ceasing its lucrative, ongoing business-
relationship with Dryvit's competitor OldCastle (a subsidiary of CRH Americas); b)
making a series of major equipment expenditures and investments into its business and
manufacturing facility to ensure it would be equipped to fulfill anticipated orders by
Dryvit's exclusive distribution network; c) entering into the Agreement, which was
exclusive; d) entering into an extension through 2023 by way of the First Addendum; and
e) signing a Second Addendum, which extended the contract through 2024.

120.     As a result of Dryvit's fraud, Acrocore has been and will continue to be severely
damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Acrocore prays for the following relief and judgment against Defendants:

A.  Awarding Acrocore Actual and Compensatory Damages, including Consequential and
Incidental Damages, in an amount that exceeds $75,000 as will be proven at trial;

B.  Awarding Acrocore Punitive Damages on Count III.

C.  For all costs, expenses, disbursements, and attorneys' fees incurred in the
commencement and prosecution of this action; and

D.  For such other and further relief as the Court may deem just and appropriate.

## DESIGNATION OF TRIAL COUNSEL

Joseph Lipari is hereby designated as trial counsel for this matter.

## JURY TRIAL DEMANDED

Acrocore respectfully demands a trial by jury.

Dated:  December 31, 2019

**SULTZER LAW GROUP P.C.**

Joseph Lipari /s/

By: _____

Joseph Lipari, Esq.
270 Madison Avenue, Suite 1800
New York, NY 10005
Tel: (917) 444-1960
Fax: (888) 749-7747
liparij@thesultzerlawgroup.com

*Counsel for Plaintiff*

24